UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| **CHRISTINA BINKLEY on behalf of J.B.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **CAUSE NO. 1:11-CV-00419** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## OPINION AND ORDER

Plaintiff Christina Binkley, on behalf of her minor child J.B., appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner"), denying her application for Supplemental Security Income ("SSI").[1] (Docket # 1.) For the following reasons, the Commissioner's decision will be AFFIRMED.

### I. PROCEDURAL HISTORY

Binkley applied on J.B.'s behalf for SSI in March 2008, alleging disability as of June 1, 2006. (Tr. 101-06.) The Commissioner denied the application initially and upon reconsideration. (Tr. 54-57, 61-63.) A hearing was held on January 27, 2010, before Administrative Law Judge ("ALJ") Yvonne Stam, at which Binkley, who was represented by counsel, and J.B.'s aunt testified. (Tr. 11-30.) On May 19, 2010, the ALJ rendered an unfavorable decision, concluding that J.B. was not disabled. (Tr. 36-48.) The Appeals Council denied her request for review, at

---

[1] All parties have consented to the Magistrate Judge. (Docket # 11); *see* 28 U.S.C. § 636(c).

which point the ALJ's decision became the final decision of the Commissioner. (Tr. 1-10, 195-96.)

Binkley filed a complaint with this Court on December 16, 2011, seeking relief from the Commissioner's final decision. (Docket # 1.)  She advances two arguments in this appeal—(1) that the ALJ improperly evaluated the opinion of Barbara Gelder, Ph.D., which then tainted the ALJ's step-three finding that J.B. did not meet or medically equal Listing 112.11, and (2) failed to evaluate the credibility of Binkey's testimony. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") 17-20.)

## II.  FACTUAL BACKGROUND[2]

### A.  Hearing Testimony

J.B. alleges disability due to attention deficit hyperactivity disorder ("ADHD"), generalized anxiety disorder ("GAD"), pervasive developmental delays, and sensory integration deficits. (Opening Br. 2.)  At the hearing, Binkley testified that J.B., who was just shy of her eighth birthday, lived with her and her husband and their two other children, who were ages nineteen and sixteen. (Tr. 15.)  She stated that J.B. performed about fifty percent of her dressing and bathing on her own, but needed assistance or reminders to complete the remaining tasks, which often turned into a "a battle." (Tr. 23, 26.)  J.B. had chores to do each evening, such as picking up toys, taking her clothes to the hamper, folding laundry, and helping sweep the kitchen, but these often did not go well due to the evening hour. (Tr. 20.)  Binkley elaborated that J.B.'s medicines are most effective between 10:00 a.m. and 4:00 p.m. and that evenings were "not real easy." (Tr. 19.)

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 503-page administrative record necessary to the decision.

Binkley further testified that J.B. was in second grade, attended regular classes rather than special education, and was struggling academically. (Tr. 16.)  She usually could not complete assignments in the time allotted to her at school. (Tr. 18.)  She did not currently have problems getting along with other children, but did so in the past. (Tr. 20-22.)  Binkley explained that J.B. was demanding, attention-seeking, and impulsive; needed "constant direction"; and did not handle criticism well, resulting in "meltdowns." (Tr. 21-22, 25-26.)  From a physical standpoint, J.B. could jump rope but could not yet ride a bike; she could use silverware but struggled with tying, zipping, and buttoning. (Tr. 22-23.)  Binkley also stated that J.B. attempted to play video games, but quickly became frustrated.[3] (Tr. 22.)

### B.  Summary of the Relevant Medical Evidence

In March 2008, J.B. was evaluated by Dr. Prevesh Rustagi, a psychiatrist. (Tr. 212-17.) Her presenting problems were sleep disruption, impulsivity, and aggressive and disruptive behavior. (Tr. 212.)  A mental status exam was largely normal except that she was "busy" and "fidgety." (Tr. 215.)  Dr. Rustagi provisionally diagnosed her with GAD and ADHD and assigned her a Global Assessment of Functioning ("GAF") score of 50.[4] (Tr. 215-16.)

On May 13, 2008, J.B. was evaluated by Candace Martin, Psy.D. (Tr. 238-40.)  Dr. Martin observed that J.B.'s attention span and concentration were fairly adequate, but that she easily became bored and wandered from her chair during the interview. (Tr. 238.)  She displayed

---

[3] J.B.'s aunt also testified at the hearing, essentially corroborating Binkley's testimony. (Tr. 27-30.)

[4] GAF scores reflect a clinician's judgment about the individual's overall level of functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed., Text Rev. 2000).  A GAF score of 41 to 50 reflects serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *Id.*  A GAF score of 51 to 60 reflects moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *Id.*

some speech articulation difficulties, but had a good vocabulary. (Tr. 238.)  Her mood was

appropriate, though she seemed on the verge of irritation when she became bored. (Tr. 238.)

Results of the WPPSI-III indicated that J.B. was functioning in the low average range of

intelligence, with a verbal IQ of 85, performance IQ of 82, processing speed of 116, and full

scale IQ of 87. (Tr. 239.)  Dr. Martin questioned whether J.B. also had an auditory sensory

processing disorder. (Tr. 239.)  Dr. Martin wrote that with medication and a strict behavioral

structure in her environment, J.B. reportedly was able to perform chores and responsible

activities typical of a child her age or older. (Tr. 239.)  She assigned J.B. a GAF of 52 and

diagnosed her with ADHD, combined type; GAD, by report; rule out bipolar I disorder; and

expressive language disorder. (Tr. 240.)

On May 30, 2008, B. Randal Horton, Psy.D., and Dr. Steven Roush, state agency doctors,

reviewed J.B.'s record and reported that she had the following impairments: a history of

congenital heart disease, asthma, history of hearing loss, GAD, and ADHD. (Tr. 246-51.)  They

found that her impairment or combination of impairments was severe, but that she did not meet

or medically equal a listing or functionally equal the listings. (Tr. 246.)  In that regard, they

found that J.B. had a "less than marked" limitation in the following domains: (1) "acquiring and

using information," because her work was just slightly below grade level, she attended regular

classes, and had IQ scores in the 80s; (2) "attending and completing tasks," because she needed

only mild prompts; (3) "interacting and relating to others," because she had a social circle; and

(4) "caring for yourself," because she had limited stress tolerance and was quite anxious at times

yet was not severely impaired from a functional standpoint. (Tr. 248-49.)  They found "no

limitations" in the domains of  "moving about and manipulating objects" and "health and

physical well-being." (Tr. 249.)  Several months later, Kenneth Neville, Ph.D., and Dr. G. Wilson reviewed J.B.'s record and rendered a similar opinion. (Tr. 261-66.)

Dr. Rustagi saw J.B. in May 2008 for medication management; he penned that her chronic worrying and somatization was being addressed by Zoloft and her ADHD by Adderall. (Tr. 254.)  She was also being evaluated for auditory processing difficulties. (Tr. 254.)  J.B. returned to Dr. Rustagi in June, and he increased her dosage of Adderall to twice daily since it wore off midday. (Tr. 255.)  On a second visit later that month, Dr. Rustagi noted that J.B. had rebound irritability with Adderall even though he had increased the dosage to twice daily. (Tr. 256.)  She also had insomnia, felt bored all the time, and was very disorganized; she worried excessively about her mom and death. (Tr. 256.)  He further adjusted her medications. (Tr. 256.)

In July 2008, Dr. Rustagi found that J.B.'s attention span and affect were "definitely more stable" during the day, but that some nights her insomnia was troublesome. (Tr. 257.)  He thought that her present medication regime was serving her well. (Tr. 257.)  The following month, J.B. was sleeping better with the Mirtazapine, and Binkley's main concern was J.B.'s anxiety; she was experiencing anticipatory anxiety about starting school and separation anxiety with respect to her mother. (Tr. 258.)  In September, J.B. was tolerating Guanfacine well but was still struggling with anxiety, insomnia, and excessive talking and clicking movements with her tongue. (Tr. 283.)

In October 2008, Dr. Rustagi noted that a school report indicated that J.B. had a significant ADHD disorder, and Binkley reported that she reversed digits and letters. (Tr. 282.)  He thought that Concerta would be the ideal medication for her. (Tr. 282.)  In November, he documented that Concerta had helped her with focus, activity modulation, and interpersonal

relations; she still had sleep problems, however, and thus he adjusted her Guanfacine dosage. (Tr. 281.)  In December, Dr. Rustagi wrote that the efficacy of Concerta was partial, but that he would not increase it due to J.B.'s age. (Tr. 280.)

In January 2009, Dr. Rustagi observed that J.B.'s mood and impulse control were doing fairly well. (Tr. 279.)  Her insomnia appeared more psychological in nature than biological. (Tr. 279.)  The following month, Dr. Rustagi wrote that J.B. was doing well enough emotionally, behaviorally, and academically to maintain the same medication regime. (Tr. 278.)  In March, Binkley reported that J.B. had been weepy over the last few weeks. (Tr. 277.)  Reports from J.B.'s teachers were inconsistent; she had started attending play and occupational therapy at the Center for Neurobehavioral Services ("CNS"). (Tr. 277.)

In February 2009, J.B. was evaluated by Barbara Gelder, Ph.D., at CNS. (Tr. 314-16.) J.B. appeared somewhat anxious, but was reasonably cooperative. (Tr. 315.)  Dr. Gelder diagnosed her with GAD, rule out dysthymia, rule out obsessive compulsive disorder, rule out thought disorder, rule out organic encephalopathy, sensory integration deficits, anoxia at birth by history, and atrial septal defect. (Tr. 316.)

In April 2009, Dr. Rustagi wrote that J.B. seemed to be responding to Concerta and that Guanfacine was helping as expected. (Tr. 326.)  Anxiety, obsessions, and control symptoms appeared prominent, but he was reluctant to start J.B. on a new medication so close to the end of the school year. (Tr. 326.)  In May, Dr. Rustagi reported that J.B. ruminates about things that could go wrong; he started her on a low dose of Citalopram. (Tr. 325.)

In May 2009, Dr. Gelder performed a neuropsychological examination. (Tr. 305-13.) J.B. was reasonably cooperative throughout the evaluation but needed directions repeated

frequently. (Tr. 307.)  She had no real understanding of simple figures speech and little understanding of conversational speech. (Tr. 307.)  Some impulsivity was noted, and she was often restless and wiggly; her thought pattern was without obvious delusion, obsession, or flight. (Tr. 307.)  Binkley responded to the Personality Inventory for Children-2, the results of which suggested that J.B. was experiencing significant emotional and behavioral maladjustment. (Tr. 307.)  Dr. Gelder administered the WISC-IV to J.B., which indicated that she was functioning in the average range of intelligence with a full scale IQ of 91. (Tr. 307.)  The ITPA-3 indicated below performance in spoken language, some difficulty knowing the meaning of common words, trouble relating the words J.B. did know to abstract concepts, and an impoverished vocabulary. (Tr. 310.)

J.B. scored in the low average range on the NEPSY-II, the results of which suggested that J.B. was beginning to exhibit subtle difficulties in her ability to process and respond to verbal instructions of increasing linguistic and syntactic complexity. (Tr. 310.)  Dr. Gelder thought that these difficulties were likely to become more pronounced as J.B. got older, particularly without intervention. (Tr. 310.)  J.B. had some difficulty following multi-step verbal requests, but exhibited a good ability to read emotional expressions in others. (Tr. 310.)  She had an adequate ability to listen attentively to extended prose, comprehend what she heard, and organize and retrieve this information. (Tr. 310.)  Results of the Vineland Adaptive Behavioral Scales indicated that J.B. was functioning in the mildly impaired range in communication skills (68), the borderline range in communication skills and daily living skills (72), and the low average range in socialization skills (81). (Tr. 310-11.)  Her overall adaptive behavior composite on the Vineland was in the mildly impaired range (68). (Tr. 311.)

Dr. Gelder opined that J.B.'s emotional profile was significant for clinical levels of inattention, distractibility, anxiety, irritability, and problematic adaptive functioning. (Tr. 311.) She concluded that J.B. could function part-time in non-academic classrooms and groups if the level of stimulus was controlled; could work briefly (two to four minutes) on sustained tasks, but rapidly reaches burnout; could follow simple one-step instructions with continual reminding and supervision; must be told and reminded to notice; and needed continual supervision to succeed. (Tr. 311.)  Dr. Gelder further articulated that J.B. had difficulty functioning in relationships, but could do so if others were patient; was often rejected by peers or adults; and needed close supervision in groups. (Tr. 311.)  She also found that J.B. needed supervision to manage her things, as she could not remember where they were and what items were needed for certain tasks. (Tr. 311.)  Dr. Gelder assigned the following diagnoses: anxiety disorder, NOS; pervasive developmental delays; ADHD; possible mood disorder, NOS; subtle language processing deficits; sensory integration deficits; anoxia at birth by history; and atrial septal defect. (Tr. 311-12.)

In June 2009, Dr. Gelder countersigned a monthly treatment plan review summarizing J.B.'s therapy. (Tr. 304.)  It was noted that J.B. easily engaged with the therapist, but was often argumentative and preoccupied during family therapy. (Tr. 304.)  She demonstrated some appropriate social skills, but had a limited span for new activities. (Tr. 304.)

That same month, Dr. Rustagi wrote that J.B.'s behavior and attention span were within acceptable limits, and he reduced her Concerta for the summer; her primary concerns were poor eating and low weight gain. (Tr. 324.)  Later that month, Binkley told Dr. Rustagi that J.B. was very whiny and difficult to manage in the evening hours; she wanted him to increase J.B.'s

8

Concerta again. (Tr. 323.)  In July, Dr. Rustagi wrote that J.B. was doing fairly well during the day, but that the evenings remained difficult. (Tr. 322.)

In August 2009, Dr. Sylvia Manalis of CNS performed an initial psychiatric evaluation. (Tr. 299-303.)  J.B. was cooperative, but mildly restless. (Tr. 301-02.)  She had ticks of picking her mosquito bites, chewing the ends of her finger, and some tongue clicking and throat clearing. (Tr. 302.)  Her affect was flat, but did improve with some smiling; she responded "yes" when asked if she heard voices. (Tr. 302.)  Dr. Manalis assigned J.B. a GAF of 50 and diagnosed her with ADHD by history, chronic insomnia, rule out anxiety disorder, language disorder, and sensory integration disorder. (Tr. 302.)  Later that same month, Dr. Gelder countersigned a monthly treatment plan review substantially similar to the June treatment plan. (Tr. 298.)

In February 2010, Dr. Gelder completed a mental impairment questionnaire on J.B.'s behalf, indicating diagnoses of anxiety disorder, NOS; pervasive developmental disorder, NOS; and ADHD. (Tr. 475-83.)  She listed J.B.'s symptoms as sleep disturbance, generalized persistent anxiety, and difficulty thinking or concentrating. (Tr. 475.)  She found that J.B. had "marked" inattention, impulsiveness, and hyperactivity. (Tr. 477.)  The marked inattention was based upon J.B.'s need to be redirected to focus on activities; the impulsiveness was based on her chewing her fingers; and the hyperactivity was based on her difficulty sitting still. (Tr. 477.)  Dr. Gelder also wrote that J.B. had a "marked" limitation in cognitive/communicative function, social function, and personal function/behavioral function. (Tr. 479-81.)

On March 17, 2010, J.B. was taken to the emergency room after having an episode at school where she was "staring off into space" and somewhat unresponsive. (Tr. 499.)  A recent EEG, however, was negative. (Tr. 499.)  The emergency room doctor's impression was possible

absent-type seizure activity and a history of ADHD. (Tr. 501.)

### C. Summary of the Relevant School Records

On April 8, 2008, Linda Lucenta completed a teacher's questionnaire, indicating that J.B. had "an obvious problem" in the domain of "acquiring and using information"; a "slight problem" in the domains of "attending and completing tasks," "interacting and relating with others," and "caring for himself or herself"; but no problem in the domain of "moving about and manipulating objects." (Tr. 151-56.)

In October 2008, Gretchen Wilhelm, the intervention assistance team coordinator at J.B.'s school, wrote that J.B. was struggling with academics across the board and that she had a major issue with retention of information. (Tr. 273.)  She seemed to have reverted back to the kindergarten level and was having to relearn all the material. (Tr. 273.)  She did not seem to be aware of her ability to work correctly; in particular, math distracted and confused her. (Tr. 273.)  Ms. Wilhelm also noted behavioral concerns about J.B.'s constant talking in class. (Tr. 273.)  She needed constant redirection to stay on task, and work that should take ten to fifteen minutes took her sixty minutes; she struggled even after assignments were modified. (Tr. 273.)  Specifically, the following academic or behavioral concerns were listed: difficulty expressing self orally/written; basic ability level/strength and weakness; keeping on task; daydreaming, sleeping, doodling, and wasting time; unusually restless; constantly talking; distracting others; disrupting class; making inappropriate noises/inappropriate language; and excitable/impulsive. (Tr. 275.)

In September 2009, the intervention assistance team wrote that J.B.'s teacher's main concern was that J.B. was "rushing" through work. (Tr. 320.)  Her mother reported that

homework is a challenge because J.B.'s medications wear off by evening. (Tr. 320.)

### III.  STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); *see* 42 U.S.C. § 1383(c)(3).  The Court's task is limited to determining whether the ALJ's factual findings are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005) (citation omitted).  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not re-weigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Id.*  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

### IV.  ANALYSIS

#### A.  The Law

To be disabled for purposes of SSI benefits, a child "must have a 'physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Brindisi ex rel Brindisi*, 315 F.3d 783, 785 (7th Cir. 2003) (quoting

11

42 U.S.C. § 1382c(a)(3)(C)(i)).  The Social Security Administration has adopted a three-step

process for determining whether a child is disabled. *Id.*; 20 C.F.R. § 416.924.

"First, if the child is engaged in substantial gainful activity, his or her claim is denied."

*Brindisi*, 315 F.3d at 785 (citing 20 C.F.R. § 416.924(a)).  "Second, if the child does not have a

medically determinable 'severe' impairment or combination of impairments, then his or her

claim is denied." *Id*. (citing 20 C.F.R. § 416.924(a)).  "Finally, for a child to be considered

disabled, the child's impairment(s) must meet, medically equal, or functionally equal the

requirements of a listed impairment . . . ." *Id*. (citing 20 C.F.R. § 416.924(a)).  "To find an

impairment functionally equivalent to a listing, an ALJ must analyze its severity in [six] age-

appropriate categories and find an 'extreme' limitation in one category or a 'marked' limitation

in two categories." *Id*. (citing 20 C.F.R. § 416.926a(a)).

## B.  The ALJ's Decision

On May 19, 2010, the ALJ issued the decision that ultimately became the

Commissioner's final decision. (Tr. 36-48.)  He found at step one of the three-step analysis that

J.B. was a "preschooler" under 20 C.F.R. § 416.926a(g)(2) on the date the application was filed

and a "school-age child" at the time of the decision, and that she had not engaged in substantial

gainful activity after the SSI application date. (Tr. 39.)  At step two, the ALJ concluded that

J.B.'s hearing loss, ADHD, and anxiety were severe impairments. (Tr. 39.)  The ALJ determined

at step three, however, that J.H.'s impairment or combination of impairments was not severe

enough to meet or medically equal a listing or functionally equal the listings. (Tr. 39-48.)

Accordingly, her claim for SSI was denied. (Tr. 48.)

*C. The ALJ's Consideration of Dr. Gelder's Opinion Is Supported by Substantial Evidence*

Binkley first argues that the ALJ improperly discounted the opinion of Dr. Gelder, who found that J.B. had "marked" inattention, impulsiveness, and hyperactivity, together with a "marked limitation" in cognitive/communicative, social, and personal/behavioral functions. Binkley emphasizes that if Dr. Gelder's opinion was credited, J.B. would meet Listing 112.11, the listing for ADHD, and be found disabled. Contrary to Binkley's assertion, the ALJ's discounting of Dr. Gelder's restrictive opinion is adequately supported.

As background, the listings describe impairments that are considered presumptively disabling when specific criteria are met. 20 C.F.R. § 416.925(a); 20 C.F.R. § 404, Subpt. P, App. 1; *see Kastner v. Astrue*, 697 F.3d 642, 646-67 (7th Cir. 2012). To meet or medically equal a listed impairment, a claimant must satisfy *all* of the criteria of the listed impairment. *Kastner*, 697 F.3d at 647; *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Maggard v. Apfel*, 167 F.3d 376, 379-80 (7th Cir. 1999). The claimant bears the burden of proving that her condition meets or medically equals a listed impairment. *Ribaudo*, 458 F.3d at 483; *Maggard*, 167 F.3d at 379-80.

To meet or medically equal Listing 112.11 (as applied to this case), a claimant must satisfy the requirements in *both* A and B:

A.  Medically documented findings of all three of the following:

1.  Marked inattention;

2.  Marked impulsiveness; and

3.  Marked hyperactivity;

B.  Resulting in at least two of the following:

13

    1.  Marked impairment in cognitive/communicative function;

    2.  Marked impairment in social functioning;

    3.  Marked impairment in personal functioning; or

    4.  Marked difficulties in maintaining concentration, persistence, or pace.

20 C.F.R. Part 404, Subpart P, App. 1, § 112.11.[5]

Here, at step three, the ALJ specifically considered Listing 112.11, but ultimately concluded that J.B. did not satisfy its criteria.  In doing so, the ALJ explained:

> Although Barbara Gelder, Ph.D., reported that the claimant has marked inattention, marked impulsiveness and marked hyperactivity, the claimant's level of functioning as noted is not so limited.  The claimant has less than marked limitations in these areas because the claimant's teachers and other treating sources have reported that the claimant is able to function after being redirected in these areas.  Although the claimant clearly has problems in these areas, based on the totality of the record including school records, marked limitations in these areas is overstated.

(Tr. 39-40 (internal citations omitted).)  The ALJ then went on to pen four paragraphs on the four areas of B2 functioning, explaining in detail her rationale for finding a "less than marked" limitation in each area.  Binkley argues, however, that the ALJ selectively reviewed the medical evidence of record and assigned too little weight to Dr. Gelder's opinion, tainting the ALJ's step-three finding that J.B. did not meet or medically equal Listing 112.11.

To review, the Seventh Circuit Court of Appeals has stated that "more weight is generally given to the opinion of a treating physician because of [her] greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870; *see* 20 C.F.R. §

---

[5] Binkley does not specifically identify Listing 112.11 by name, but her argument centers on its requirements.  She does *not* argue that J.B. functionally equals the listings and thus has waived that contention. *See Rogers v. Barnhart*, 446 F. Supp. 2d 828, 851 (N.D. Ill. 2006) (citing *Carter v. Tennant Co.*, 383 F.3d 673, 679 (7th Cir. 2004)).

416.927(c)(2).  This principle, however, is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870; *see Johansen v. Barnhart*, 314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. § 416.927(c)(2).

Here, the ALJ correctly observed that Dr. Gelder's restrictive opinion was at odds with the findings of Dr. Rustagi, J.B.'s treating psychiatrist; Dr. Martin, an examining psychologist; and Drs. Horton, Roush, Neville, and Wilson, the state agency doctors, as well as J.B.'s school records. *See Skarbek v. Barnhart*, 390 F.3d 500, 503-04 (7th Cir. 2004) (explaining that a treating physician's opinion is not entitled to controlling weight where it is inconsistent with other medical source opinions of record).  Thus, there is no dispute that Dr. Gelder's opinion did not merit controlling weight.

In the event the treating physician's opinion is not entitled to controlling weight, the Commissioner applies the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 416.927(c); *see Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).  Binkley alleges, among other things, that the ALJ did not adequately consider these factors when weighing Dr. Gelder's opinion.

But the ALJ *did* explicitly consider two of the factors—Dr. Gelder's specialty and the

consistency between her opinion and the record as a whole—when weighing the opinion.  That

is, she reasonably acknowledged that Dr. Gelder was a psychologist in referring to her "Ph.D"

credentials and, more importantly, correctly noted that her opinion was quite inconsistent with

the other medical source opinions of record.  Since Dr. Gelder only evaluated J.B. twice and

merely countersigned monthly treatment plans, Binkley primarily faults the ALJ for failing to

discuss the supportability of Dr. Gelder's opinion—namely, that Dr. Gelder administered certain

standardized tests, including the WISC-IV, NEPSY-II, ITPA-3, and the Vineland Adaptive

Behavior Scales.

But with respect to 20 C.F.R. § 416.927(c), an ALJ's decision "need only include 'good

reasons' for the weight given to the treating source's opinion rather than 'an exhaustive

factor-by-factor analysis.'" *Hanson v. Astrue*, No. 10-C-0684, 2011 WL 1356946, at *12 (E.D.

Wis. Apr. 9, 2011) (quoting *Francis v. Comm'r Soc. Sec. Admin.*, No. 09-6263, 2011 WL

915719, at *3 (6th Cir. Mar. 16, 2011)); *see also Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th

Cir. 2007) ("Ms. Oldham cites no law, and we have found none, requiring an ALJ's decision to

apply expressly each of the six relevant factors in deciding what weight to give a medical

opinion."); *Brown v. Barnhart*, 298 F. Supp. 2d 773, 792 (E.D. Wis. 2004) (stating that there is

no "articulation requirement for each and every factor" and that "ALJs are not required to

produce prolix opinions containing checklists from all of the regulations" (emphasis omitted)).

Here, the ALJ explained that Dr. Gelder's opinion was significantly inconsistent with the other

medical source opinions of record and J.B.'s school records, which is sufficient. 20 C.F.R. §

416.927(c)(4) ("Generally, the more consistent an opinion is with the record as a whole, the

more weight we will give to that opinion."); *see Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir.

16

2008) ("If the ALJ discounts the physician's opinion after considering these factors, we must

allow that decision to stand so long as the ALJ minimally articulate[d] [her] reasons—a very

deferential standard that we have, in fact, deemed lax." (internal quotation marks and citation

omitted)).

Binkley's first argument segues into her second—namely that the ALJ "cherry-picked"

the record by failing to discuss results of the standardized tests administered by Dr. Gelder.  But

contrary to Binkley's assertion, the ALJ *did* cite to Dr. Gelder's neuropsychological examination

when discussing J.B.'s IQ scores and thus obviously considered the results of the WISC-IV that

Dr. Gelder administered. (*See* Tr. 40 (citing Ex. 34F).)  In any event, "an ALJ need not mention

every snippet of evidence in the record . . . ." *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2002).

Rather, an ALJ "must connect the evidence to the conclusion, [and] in so doing, [s]he may not

ignore entire lines of contrary evidence." *Id*.; *see also Terry v. Astrue*, 580 F.3d 471, 477 (7th

Cir. 2009) ("Although an ALJ need not discuss every piece of evidence in the record, the ALJ

may not ignore an entire line of evidence that is contrary to the ruling.").

In that vein, Binkley hones in on the results of the Vineland, explaining that even though

J.B. scored in the "mildly impaired range," her composite and communication scores (68) were

still more than two standard deviations below the "norm" or "mean" (100) for the Vineland. *See*

ATT-Training, http://www.att-training.org/sample-page/Vineland (last visited January 16, 2013).

She explains that "[w]hen standardized tests are used as the measure of functional parameters, a

valid score that is two standard deviations below the norm for the test will be considered a

marked restriction." 20 C.F.R. Part 404, Subpart P, App. 1, § 112.00(C).

But even if the Vineland is evidence of a marked restriction in one or more B2 functions,

to meet or medically equal a listed impairment, a claimant must satisfy *all* of the criteria of the

listed impairment. *Kastner*, 697 F.3d at 647; *Ribaudo*, 458 F.3d at 583; *Maggard*, 167 F.3d at

379-80.  Here, Binkley fails to show how the Vineland test score, standing alone, satisfies all of

the B1 criteria of Listing 112.11 (marked inattention, impulsiveness, and hyperactivity), in

addition to at least two of the B2 functions (marked impairment in age-appropriate

cognitive/communicative, social, personal, and concentration, persistence, or pace functioning).

*See* 20 C.F.R. § 416.924a(1)(ii) ("We consider all of the relevant information in your case record

and will not consider any single piece of evidence in isolation.  Therefore, we will not rely on

test scores alone when we decide whether you are disabled.").  Indeed, Binkley does not argue

that any of the other tests scores support a "marked" limitation; in fact, the full scale IQ of 91 she

achieved on the WISC-IV placed her in the average range of intelligence.  To reiterate, the

claimant bears the burden of proving that her condition meets or medically equals a listed

impairment, *Ribaudo*, 458 F.3d at 483; *Maggard*, 167 F.3d at 379-80, and here Binkley fails to

carry that burden with respect to Listing 112.11.[6]

Not to be deterred, Binkley also contends that the ALJ selectively reviewed the evidence

when weighing the medical source opinions of record and that this resulted in an unwarranted

---

[6] And even if Binkley had not waived her argument that J.B. functionally equaled the listings, the Vineland score does not merit reversal on that front either.  To determine whether a child functionally equals the listings, the ALJ assesses how a child functions in six domains: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1).  If the child's impairments cause "marked" limitations in two domains or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled. 20 C.F.R. § 416.926a(d).

Social Security regulation 20 C.F.R. 416.926a(e)(2) explains that when assessing whether a child functionally equals the listings, a "marked" limitation can be shown by "two deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, *and your day-to-day functioning in domain-related activities is consistent with that score*." (Emphasis added).  Here, the ALJ concluded that J.B.'s day-to-day functioning was not consistent with a "marked" limitation in any of the six domains. (Tr. 42-48.)

discounting of Dr. Gelder's opinion.  More specifically, she asserts that the ALJ cited Dr. Rustagi's documentation in April and May 2008 reflecting that J.B. no longer had "meltdowns" and anger outbursts and that her chronic worrying and obsessions were being controlled by Zoloft (Tr. 253-54), but then failed to mention that Dr. Gelder wrote in her May 2009 evaluation that Binkley reported that J.B. had meltdowns, became upset when she was not the center of attention, and spent quite a bit of time worrying. (Tr. 305).  Binkley also criticizes the ALJ for not specifically mentioning Dr. Gelder's impressions that J.B. needed continual supervision to succeed, could work only two to four minutes in sustained tasks, had trouble functioning in relationships, and was disorganized and easily lost items. (Tr. 311.)

But Binkley fails to show how Dr. Gelder's impressions rise to an "entire line of evidence" contrary to the ALJ's ruling. *Terry*, 580 F.3d at 477.  The ALJ, in fact, agreed and acknowledged that J.B. "needs helps staying on task and that her anxiety interferes with her ability to complete tasks." (Tr. 44.)  She concluded, however, based on the totality of the record, including all of the medical source opinions, school records, and testimony, that J.B.'s limitations did not rise to the level of a "marked" level of impairment—that is "more than moderate but less than extreme." 20 C.F.R. Part 404, Subpart P, App. 1, § 112.00(C).  Not only does Binkley fail to show how these snippets of evidence equate to a "marked" impairment, but she certainly falls short of establishing that they satisfy *all* of the criteria of Listing 112.11, *Kastner*, 697 F.3d at 647; *Ribaudo*, 458 F.3d at 583; *Maggard*, 167 F.3d at 379-80—a burden that she must carry, *Ribaudo*, 458 F.3d at 483; *Maggard*, 167 F.3d at 379-80.

Moreover, in reaching her finding that J.B. did not meet or equal Listing 112.11, the ALJ relied upon the assessments of Drs. Horton and Neville, the state agency psychologists who

concluded that J.B.'s impairments did not meet or equal a listing.  In addition to completing

Childhood Disability Evaluations Forms indicating that J.B. did not meet or equal a listing (Tr.

246-47, 261-62), they also completed Disability Determination and Transmittal forms at the

initial and reconsideration levels and concluded that J.B. was not disabled (Tr. 31-32).  The

Seventh Circuit has articulated that "[t]hese forms conclusively establish that consideration by a

physician . . . designated by the Commissioner has been given to the question of medical

equivalence at the initial and reconsideration levels of administrative review." *Scheck v.

Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citations and internal quotation marks omitted).

Consequently, "[t]he ALJ may properly rely upon the opinion of these medical experts." *Id*.

(citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990)); *see also* SSR 96-6p, 1996 WL

374180, at *2.

   Of course, "in, the end, it is up to the ALJ to decide which doctor to believe . . . subject

only to the requirement that the ALJ's decision be supported by substantial evidence." *Books v.

Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (citation and internal quotation marks omitted); *accord

Micus v. Bowen*, 979 F.2d 602, 608 (7th Cir. 1992).  Here, the reasons provided by the ALJ for

discounting of Dr. Gelder's restrictive opinion and finding that J.B. did not meet or equal Listing

112.11 are sufficiently supported, and the Court will not accept Binkley's invitation to merely

reweigh the evidence at this juncture. *See Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000);

*see Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000) ("[W]e cannot reweigh the evidence or

substitute our own judgment for that of the ALJ.").  Accordingly, Binkley's first argument is

unpersuasive.

### D. The ALJ's Failure to Articulate a Credibility Determination Is Harmless Error

Binkley also tersely argues that the ALJ erred by failing to evaluate the credibility of her testimony.  Indeed, the ALJ failed to fulfill her duty in that regard, *see* SSR 96-7p; her oversight, however, is mere harmless error. *See Skarbek*, 390 F.3d at 504 (explaining that an error is harmless when it "would not affect the outcome of the case").  This is because Binkley's cursory argument fails to show how her testimony, even if fully credited, establishes that J.B. meets or equals Listing 112.11 or functionally equals the listings.

To explain, the ALJ penned five paragraphs summarizing Binkley's testimony; thus, the ALJ considered Binkley's testimony at length. (Tr. 41-42.)  She then cited Binkley's testimony in support of several of her findings concerning the domains of functional equivalence. (*See, e.g.*, Tr. 44 ("The claimant needs help staying on task and her anxiety interferes with her ability to complete tasks."), 45 ("The claimant's mother testified that her daughter had trouble keeping friends last year because she is bossy and demanding, however, this year she did not have problems."), 46 ("The claimant still is unable to ride a bike and button her clothes.  The claimant can jump rope and she is able to zip a zipper, but cannot connect a separating one.  The claimant's video game skills are still below age level."), 47 ("The claimant still needs assistance with showering and washing her hair, but she continues to make progress.  She also has problems getting appropriate attention, but there are signs of growth there.").)  Significantly, the plaintiff bears the burden of producing evidence of disability and here Binkley's testimony fails to do so.

In short, because the outcome of the ALJ's decision would not change even if Binkley's testimony is fully credited, the ALJ's failure to articulate a specific credibility determination

21

about such testimony does not necessitate a remand of the decision. *Skarbek*, 390 F.3d at 504; *see Fisher v. Bowen*, 869 F.2d 1055, 1057 (7the Cir. 1989) ("So the administrative law judge's opinion is vulnerable.  But that is nothing new.  No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

## V.  CONCLUSION

For the reasons articulated herein, the decision of the Commissioner is AFFIRMED.  The Clerk is directed to enter a judgment in favor of the Commissioner and against Binkley.

SO ORDERED.

Enter for this 22nd day of January, 2013.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge

22